# COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00413-CR

**Hector Vega-Gonzalez, Appellant**

.

**v**

**The State of Texas, Appellee**

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-16-904055, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Hector Vega-Gonzalez was convicted of the offense of sexual assault and was sentenced to fifteen years' imprisonment. *See* Tex. Penal Code §§ 12.33, 22.011. On appeal, Vega-Gonzalez contends that the trial court violated his confrontation rights when it improperly limited his cross-examination, that the trial court improperly granted the State's relevancy objection, and that his right to a speedy trial was violated. We will modify the trial court's judgment of conviction to correct two non-reversible errors and affirm the trial court's judgment as modified.

## BACKGROUND

Vega-Gonzalez was charged with and tried for sexual assault. During the trial, Jessica Riley (pseudonym), her mother, her friend Brandon Gaskill, two other friends, police

officers, forensic scientists, and a Sexual Assault Nurse Examiner ("SANE") all testified. The offense was alleged to have occurred early in the morning on New Year's Day.

According to Riley, she decided to go out on New Year's Eve in downtown Austin, Texas, with one of her friends to celebrate at a bar until closing time. After the bar closed, Riley could not locate her car key and called several people, including her mother, to see if someone could give her a ride back to her home in Cedar Park, Texas. At some point, Riley's friend left the area outside the bar with other friends. While Riley was talking with the bouncer about what she should do, a man that Riley later identified as Vega-Gonzalez approached her and talked with her about her situation. At some point, Riley's phone died, and Vega-Gonzalez told Riley that she could charge her phone in his car. Riley agreed and got in Vega-Gonzalez's car. During their conversation, Vega-Gonzalez offered to drive Riley home, and Riley accepted his offer. While Riley was on the phone with her mother, her mother heard a man offer to give Riley a ride home. When Riley was riding in Vega-Gonzalez's car, she spent much of the time texting with her friends. After looking up from her phone, Riley realized that they were not heading toward Cedar Park. When she asked Vega-Gonzalez where they were, he told her that he had to get something from his house before taking her home.

After stopping at a house, Vega-Gonzalez told Riley to go inside, but she stated that she was not comfortable going inside the house. Vega-Gonzalez aggressively told Riley that she "needed to go inside" and "wasn't giving [her] a choice." While walking to the house, Riley called her friend Gaskill. Once they arrived at the door of the home, Vega-Gonzalez grabbed her, pulled her inside, locked the door, and "started to kiss her." Riley pushed Vega-Gonzalez off and told him to stop, but he then proceeded to kiss her more forcefully. They struggled, and Riley at some point lost her phone. During the struggle, Vega-Gonzalez forced Riley to the

2

floor, got on top of her, pinned her arms above her shoulders, forcefully "stuck his fingers up" her vagina several times, and told her to "just let it happen." Riley struggled to escape and yelled at Vega-Gonzalez to stop and get off her. Ultimately, Vega-Gonzalez did get off her, apologized for his actions, and returned her phone to her. During the trial, Riley denied consenting to any sexual contact, and Gaskill testified that while he was on the phone with Riley, he heard a male voice arguing with Riley and Riley saying that she did not want to go inside a building. Further, Gaskill related that before the call ended, he heard Riley screaming at someone to "[s]top," begging the person to let her "go home," and telling the person to get off her.

After Vega-Gonzalez apologized, Riley told him that she was going to call a friend to come pick her up and then headed outside. Once she got outside, she ran and screamed for help, but no one answered. While running, Riley called Gaskill again, found a house that was unlocked, and went inside. When Riley went inside the home, Gaskill told her to hang up and call the police, and she called 911. A recording of the 911 call was admitted into evidence. On the recording, Riley states that a man told her that he would drive her home to Cedar Park, that she later ran away from the man, that she went inside a house with an unlocked door, that the man was driving around looking for her, and that she was scared to go outside.

Within a few minutes of Riley's calling 911, a police officer arrived, and Riley told the officer what happened. In addition, after seeing a car resembling Vega-Gonzalez's driving toward her, Riley told the officer that she recognized the car. The officer pulled the car over, and Riley identified Vega-Gonzalez as the man who sexually assaulted her. The police took photos of injuries to Riley's knees, thighs, and lower legs, and Riley testified that she did not have those injuries before going out that night. Although Riley agreed that it was possible that she might have injured her knees while running away from the house, she believed that the

3

bruises on her legs were not caused by running from the house. At trial, Riley's mother testified that Riley "had bruises all over her" that she did not have when she left home to go out on New Year's Eve.

One of the responding police officers drove Riley to Safe Place so that a SANE could examine her. Riley informed the SANE that Vega-Gonzalez said that he would drive her home but instead drove her to a house, forced her to go inside a house, physically restrained her, kissed her, licked around her mouth, and digitally penetrated her vagina. Riley told the SANE that she struggled to get away, yelled at Vega-Gonzalez, and ran to a neighboring house to call 911. While being examined by the SANE, Riley stated that she had inserted a tampon earlier that evening and was concerned that it had been displaced, and the SANE was unable to locate the tampon. The police later found the tampon inside the house that Riley ran from. During the exam, the SANE collected samples from Riley's body for DNA testing. The SANE documented multiple injuries to Riley's arms, hands, thighs, knees, labia, and hymen. Further, the SANE testified that the injuries to Riley's sexual organ were consistent with digital penetration and sexual assault. The SANE also noted at trial that some of Riley's injuries were consistent with falling. Photographs of injuries that Riley sustained during the alleged assault, including injuries to her sexual organ, were admitted into evidence.

Testing performed on a swab of the area around Riley's mouth revealed a DNA mixture from two contributors and showed that the likelihood of obtaining that "mixture profile is 3.53 billion times more likely if the DNA came from . . . Riley and . . . Vega-Gonzalez than if the DNA came from . . . Riley and an unrelated unknown person." Similarly, testing performed on a swab of Riley's palm revealed a DNA mixture from two individuals and demonstrated that the likelihood of obtaining that "mixture is 530 thousand times more likely if the DNA came

4

from . . . Riley and . . . Gonzalez than if the DNA came from . . . Riley and one unrelated unknown person."

After considering the evidence presented at trial, the jury convicted Vega-Gonzalez of sexual assault. Vega-Gonzalez appeals the trial court's judgment of conviction.

## DISCUSSION

In his first issue on appeal, Vega-Gonzalez argues that the trial court violated his confrontation rights by limiting his cross-examination of the SANE and preventing him from asking the SANE about any prior acts of self-harm that Riley may have committed. In a related issue, Vega-Gonzalez contends that the trial court erred when it sustained the State's relevancy objection to testimony from the SANE regarding any acts of self-harm that Riley may have committed. In his third issue on appeal, Vega-Gonzalez urges that the trial court erred by failing to dismiss the case for want of a speedy trial.

### Testimony from the SANE

During the testimony of the SANE, Vega-Gonzalez asked if the SANE made a note in her report regarding Riley previously engaging in self-harm. At that point, the State objected on relevancy grounds, and Vega-Gonzalez argued that the testimony was relevant to his defensive theory that Riley inflicted some of the injuries herself and had a history of inflicting injuries on herself and blaming others. Further, Vega-Gonzalez asserted that Riley told the SANE that she committed an act of self-harm while in high school and that the incident could have happened within six or seven months of the alleged assault because Riley was nineteen years old at the time of the offense. But Vega-Gonzalez admitted that he did not know

5

specifically when the act of self-harm allegedly occurred. After considering the parties' arguments, the trial court sustained the State's relevancy objection.

At the end of the proceedings on that day, Vega-Gonzalez indicated that he would like to make an offer of proof regarding the SANE's testimony and informed the trial court that the judge did not need to be there while he made his offer. After the proceedings concluded and the trial judge left the courtroom, Vega-Gonzalez stated to the court reporter that he expected the SANE to testify that she was "aware of mental health issues and instances of self-harm," that "Riley had recently attempted to commit suicide," and that there were other "instances of self-harm or self-inflicted harm." Moreover, Vega-Gonzalez asserted that he believed that this evidence was "admissible and relevant for the purpose of looking at the mental state of the complaining witness at or near the time of the events" and could have shown "an independent mechanism of injury" if the jury believed that she "inflicted the wounds that are present in this case upon herself." Additionally, Vega-Gonzalez contended that the jury could have believed that the "emotional distress" exhibited by Riley and described by multiple witnesses was actually caused by her "self-harm issues." Further, Vega-Gonzalez argued that sustaining the State's objection undermined his "strategic defense and ability to afford him due process."

In his first issue on appeal, Vega-Gonzalez contends that the trial court violated his confrontation rights when it sustained the State's objection to his cross-examination of the SANE. However, as summarized above, Vega-Gonzalez did not argue to the trial court that limiting his cross-examination of the SANE violated his confrontation rights; instead, he argued that the cross-examination was relevant. The trial court sustained the State's relevancy objection and made no further ruling pertaining to testimony from the SANE regarding any incident of self-harm allegedly committed by Riley.

6

To preserve an issue for appellate review, the record must show that "the complaint was made to the trial court" and that the trial court made a ruling or refused to make a ruling. *See* Tex. R. App. P. 33.1. By failing to present any confrontation complaint to the trial court, Vega-Gonzalez failed to preserve that complaint for appellate consideration. *See Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018) (concluding that nothing in record indicated that defendant "properly put the trial judge on notice that he was making a Confrontation Clause argument in support of admitting the excluded evidence" and noting that parties are not allowed to bootstrap constitutional issue from innocuous trial objection); *see also Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (explaining that constitutional errors "can be forfeited" when "party fails to properly object"); *Rice v. State*, No. 09-14-00174-CR, 2016 WL 4040117, at *5 (Tex. App.—Beaumont July 27, 2016, no pet.) (mem. op., not designated for publication) (noting that "[a] defendant fails to preserve error regarding an alleged violation of his constitutional right to confront witnesses if he does not timely and specifically object *on that basis* at trial") (emphasis added). Although Vega-Gonzalez briefly asserted after the trial court made its ruling that the ruling denied him due process, that argument was made outside the court's presence. *See Clark*, 365 S.W.3d at 339-40 (explaining that purposes of requiring objection "are to inform the trial judge of the basis of the objection so that he has an opportunity to rule on it and to allow opposing counsel to remedy the error" and noting that need for informing court of basis for objection is even more important when alleged error is constitutional in nature "because constitutional error is subject to a much stricter harm analysis on appeal," which could result in conviction being "overturned on what appears to be an evidentiary ruling" when trial court was not given "the chance to rule on the specific constitutional objection").

Accordingly, we overrule Vega-Gonzalez's first issue on appeal.

7

In his second issue on appeal, Vega-Gonzalez contends that the trial court erred by sustaining the State's relevancy objection to his cross-examination of the SANE regarding her knowledge of any acts of self-harm allegedly committed by Riley. More specifically, Vega-Gonzalez contends that the objected-to testimony "was directly relevant to the matters present at trial" because the testimony would have "related to whether the injuries claimed by the State to be the result of the assault were self-inflicted" and because the testimony was "central to a defense theory in the matter."

Under the Rules of Evidence, "[r]elevant evidence is admissible unless" provided otherwise by "the United States or Texas Constitution," "a statute," the Rules of Evidence, or "other rules prescribed under statutory authority," and "[i]rrelevant evidence is not admissible." Tex. R. Evid. 402. Moreover, "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." *Id.* R. 401. "To be relevant, evidence must be both material—that is, it must be offered for a proposition that is of consequence to the determination of the case—and probative, such that it makes the existence of the fact more or less probable than it would otherwise be without the evidence." *Boudreaux v. State*, No. 14-18-00891-CR, 2020 WL 2214447, at *9, __ S.W.3d __, (Tex. App.—Houston [14th Dist.] May 7, 2020, pet. ref'd). "It is critical that there is a direct or logical connection between the actual evidence and the proposition sought to be proved." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

Appellate courts review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *see Lopez v. State*,

8

86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).  Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling in light of the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

Although Vega-Gonzalez asserted at trial that the testimony would be relevant to his theory that Riley might have caused some of the injuries seen on the night in question "if she has a prior history of self-inflicting trauma[] and assigning it to other individuals," there was nothing before the trial court at the time of its ruling indicating that Riley engaged in an act of self-harm that she blamed on someone else or that the prior act somehow related to a sexual-assault allegation.  Furthermore, although Vega-Gonzalez estimated that the prior act could have happened six or seven months before the offense in question because Riley informed the SANE that the incident of self-harm occurred when she was in high school and because Riley was nineteen at the time of the alleged offense, he admitted to the trial court that he did not know when the act allegedly occurred.

In light of the record before the trial court when it made its ruling, we cannot conclude that the trial court abused its discretion by determining that evidence regarding a prior act or acts allegedly committed by Riley at some earlier time in high school would not make a fact of consequence in this case more or less probable. *Cf. Johnson v. State*, No. 14-01-00987-CR, 2002 WL 31318668, at *2, *3 (Tex. App.—Houston [14th Dist.] Oct. 17, 2002, no pet.) (op., not designated for publication) (concluding that trial court did not abuse its discretion by sustaining

9

State's relevancy objection to evidence of prior reprimand where prior reprimand occurred "five years before [defendant]'s offense" because evidence would not have been "relevant to issue of [defendant]'s guilt on the charged offense").

Moreover, even if the evidence was relevant in this case, we would still be unable to sustain Vega-Gonzalez's second issue on appeal. The exclusion of evidence is non-constitutional error. *See Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005). Because the alleged error involves non-constitutional error, it "must be disregarded" unless it affected Vega-Gonzalez's "substantial rights." Tex. R. App. P. 44.2(b). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In determining whether a defendant's substantial rights were affected, the reviewing "court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). "The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable." *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002). If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Id.* at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

During the trial, the jury was presented with evidence indicating that Vega-Gonzalez was guilty of the charged offense through multiple sources. *Cf. Geuder v. State*,

10

142 S.W.3d 372, 376 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (noting that "the presence of overwhelming evidence of guilt may be considered" when performing "a general 44.2(b) harm analysis"). First, Riley testified that Vega-Gonzalez tried to kiss her and then sexually assaulted her after offering to drive her home on the night in question, that she repeatedly told him to stop and to get off her, and that she did not consent to the sexual contact. Riley also explained that she called her friend Gaskill shortly before the incident and that she ran to a neighbor's house to safely call the police. Further, Riley related that she identified Vega-Gonzalez as her attacker when the police arrived and saw him driving in his car, and Riley also identified Vega-Gonzalez as her attacker during the trial. Riley's testimony was corroborated by the 911 recording and the testimony from Gaskill, the responding police officer, and the SANE.

Additionally, Riley testified that she did not have any injuries on her body prior to her interaction with Vega-Gonzalez, and Riley's mother also testified that Riley did not have bruises on her body before she left for the evening. In addition, the SANE explained that Riley had lacerations to her labia as well as to her hymen and that the injuries were consistent with digital penetration and sexual assault. Furthermore, testing performed on swabs taken from around Riley's mouth and from her palm revealed a DNA mixture from two people that was consistent with a DNA mixture from Riley and Vega-Gonzalez.

Further, although Vega-Gonzalez was not allowed to present evidence regarding whether Riley previously engaged in acts of self-harm, he did present other defensive theories by asserting in his closing argument that the State failed to prove that he penetrated Riley's vagina, that he caused the injuries described during the trial, and that she did not consent to the sexual contact. Moreover, Vega-Gonzalez argued that the State failed to meet its burden because it chose not to test all the swabs collected from him and Riley during the investigation, including

11

swabs taken from his fingers. Additionally, Vega-Gonzalez asserted that the State did not obtain any phone records from Riley's cellphone to corroborate her testimony. Next, Vega-Gonzalez contended that there were chain-of-custody issues with some of the State's evidence. Finally, Vega-Gonzalez argued that Riley could have initially consented to the sexual behavior, changed her mind, run away from the house, and injured herself by falling when she ran from the house.

In light of the preceding, we conclude that any error stemming from the trial court's decision to sustain the State's relevancy objection and to exclude the evidence at issue did not have "a substantial and injurious effect or influence in determining the jury's verdict" and therefore did not affect Vega-Gonzalez's substantial rights. *See King*, 953 S.W.2d at 271. Accordingly, we hold that any error would be harmless. *See* Tex. R. App. P. 44.2(b).

For these reasons, we overrule Vega-Gonzalez's second issue on appeal.

**Speedy Trial**

In his third issue on appeal, Vega-Gonzalez contends that the trial court erred when it denied his "motion to dismiss for want of a speedy trial." *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10.[1]

---

[1] In its brief, the State contends that this issue was not preserved for appellate consideration. *See Henson v. State*, 407 S.W.3d 764, 768 (Tex. Crim. App. 2013) (explaining that "preservation requirements . . . apply to speedy-trial claims"). Although the State agrees that the trial court held a hearing considering Vega-Gonzalez's motion to dismiss on speedy-trial grounds, it argues that the trial court did not make an explicit ruling during the hearing. Similarly, although the State acknowledges that Vega-Gonzalez filed an amended motion to dismiss on speedy-trial grounds after the hearing and that the trial court denied that motion during voir dire, the State contends that the primary basis for dismissal alleged in the amended motion was a discovery issue and that this ground was insufficient to preserve the appellate complaint at issue in this appeal. Given that there was a hearing on Vega-Gonzalez's motion to dismiss and given that the trial court made an explicit ruling in a subsequent hearing and proceeded to trial, we conclude that his third issue has been preserved for appeal. *Cf. Washington v. State*, No. 02-14-00454-CR, 2016 WL 4538566, at *7 (Tex. App.—Fort Worth

"The constitutional right to speedy trial protects defendants from oppressive pretrial incarceration, mitigates the defendant's anxiety and concern from public accusations, and ensures that the defendant can mount a defense." *State v. Davis*, 549 S.W.3d 688, 697 (Tex. App.—Austin 2017, no pet.); *see also Leachman v. Stephens*, 581 Fed. Appx. 390, 402 (5th Cir. 2014) (explaining that right to speedy trial applies to states through Fourteenth Amendment). However, unlike other constitutional rights, the deprivation of the right can benefit a defendant by "making it more difficult for the prosecution to meet its burden of proof." *Henson v. State*, 407 S.W.3d 764, 766-67 (Tex. Crim. App. 2013). Moreover, the right to a speedy trial is "a more vague concept than other procedural rights," and the violation of the right leads to a "more serious" remedy than the remedy for other violations because it results in the "dismissal of the indictment." *Barker v. Wingo*, 407 U.S. 514, 521, 522 (1972). "There is no fixed amount of delay that is too much." *Henson*, 407 S.W.3d at 767. "The right to a speedy trial attaches when a person becomes an accused," which "can be when he is arrested or when he is charged." *Id.*

Speedy-trial claims are analyzed by "applying the fact-specific balancing test set forth in *Barker*, under which the conduct of the prosecution and the defendant are weighed based on four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) any prejudice inflicted by the delay." *Davis*, 549 S.W.3d at 697. "Texas courts apply the same *Barker* test for speedy-trial analysis under state law as under federal law." *Id.*; *see Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992). Appellate courts balance these factors "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a

Aug. 31, 2016, pet. ref'd) (mem. op., not designated for publication) (assuming "that the trial court impliedly overruled an assertion of Washington's right to a speedy trial" and addressing "the merits of his issue").

13

speedy trial has been infringed." *Balderas v. State*, 517 S.W.3d 756, 773 (Tex. Crim. App. 2016) (quoting *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008)). "If the delay is unreasonable enough to be presumptively prejudicial, the first *Barker* factor is satisfied and consideration of the remaining three factors is triggered." *Davis*, 549 S.W.3d at 697. Although the amount of delay that will provoke a speedy-trial inquiry is "necessarily dependent upon the peculiar circumstances of the case," *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) (quoting *Barker*, 407 U.S. at 530-31), in general, delays "approaching one year" are sufficient to warrant a speedy-trial inquiry, *Balderas*, 517 S.W.3d at 768.

"Under the *Barker* test, the State bears the burden of justifying the length of the delay, while appellant must meet his burden of proving his assertion of the right to speedy trial and showing prejudice." *Davis*, 549 S.W.3d at 697. "The defendant's burden of proof on the latter two factors 'varies inversely' with the State's degree of culpability for the delay." *Cantu*, 253 S.W.3d at 280 (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Id.* at 280-81. "[T]he four factors are related and must be considered together along with any other relevant circumstances." *Id.* at 281. "As no factor possesses 'talismanic qualities,' courts must engage 'in a difficult and sensitive balancing process' in each individual case." *Id.* (quoting *Zamorano*, 84 S.W.3d at 648). "Because dismissal of the charges is a radical remedy, a wooden application of the *Barker* factors would infringe upon 'the societal interest in trying people accused of crime, rather than granting them immunization because of legal error.'" *Id.* (internal footnote omitted) (quoting *United States v. Ewell*, 383 U.S. 116, 121 (1966)). "The constitutional right is that of a speedy trial, not dismissal of the charges." *Id.*

14

Appellate courts "review factual components of the court's ruling on a speedy-trial claim for an abuse of discretion and review legal determinations de novo, but the balancing test as a whole presents a purely legal question." *Davis*, 549 S.W.3d at 697-98. Accordingly, "appellate courts defer not only to a trial judge's resolution of disputed facts, but also to his right to draw reasonable inferences from those facts." *Cantu*, 253 S.W.3d at 282. "In assessing the evidence at a speedy-trial hearing, the trial judge may completely disregard a witness's testimony, based on credibility and demeanor evaluations, even if that testimony is uncontroverted." *Id.* at 282. "And all of the evidence must be viewed in the light most favorable to his ultimate ruling." *Id.*

*Length of Delay*

As an initial matter, we must determine the length of the delay and decide whether the length of the delay was presumptively prejudicial in order to determine whether it is necessary to consider the remaining *Barker* factors. *See State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). During the speedy-trial hearing, the State asserted that Vega-Gonzalez was arrested on January 1, 2016, and the indictment in the clerk's record shows that he was charged with sexual assault in July 2016. The trial in this case did not start until May 13, 2019. Regardless of whether the time is measured from when Vega-Gonzalez was arrested or formally charged, years passed between when the right to a speedy trial attached and when the trial commenced.[2] Accordingly, we conclude that the delay in this case was presumptively prejudicial and consider the remaining *Barker* factors.

---

[2] In its brief, the State recognizes on appeal that the length of the delay here exceeds the one-year delay generally triggering the need to examine the remaining *Barker* factors, but it asserts that the delay in this case "did not cross the threshold from ordinary delay to

15

*Reason for the Delay*

When appellate courts consider the reason for the delay, they "assign different weights to different reasons" because "[s]ome reasons are valid and serve to justify an appropriate delay." *Id.* "Deliberate delay intended to 'hamper the defense' weighs heavily against the State, while more neutral reasons, such as negligence or overcrowded courts, weigh less heavily." *Id.* (quoting *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)). Appellate courts also consider whether the defendant or the State is more responsible for the delay. *Id.* "Delay caused by the defendant or his counsel weighs against the defendant," but "[d]elay caused by law enforcement or the prosecution weighs against the State." *Davis*, 549 S.W.3d at 699.

During the hearing on the motion to dismiss, Vega-Gonzalez explained that in June 2018, over two years after he was arrested, he filed a motion invoking his right to a speedy trial, and he also asserted that there had been multiple trial settings following his invocation of that right.[3] Similarly, Vega-Gonzalez related that he filed a motion to dismiss for lack of a speedy trial in April 2019 in response to the State moving for a continuance. Additionally, Vega-Gonzalez argued that the reasons for the delay were entirely attributable to the State's negligent efforts in procuring evidence and to the State's delay in seeking DNA testing. For example, Vega-Gonzalez asserted that DNA testing was first requested in this case in October 2016 and that a report regarding the testing was issued in November 2017 but that an additional item was not submitted for DNA testing until September 2018. Moreover, although Vega-

---

presumptively prejudicial delay" because, according to the State, Vega-Gonzalez's own actions contributed to the delay at issue. We believe that those arguments are more fairly addressed in the *Barker* factor addressing the reasons for the delay.

[3] We note that the earliest reporter's record in this case comes from the arraignment in March 2019.

16

Gonzalez acknowledged that there had been plea negotiations in this case, he denied that those negotiations delayed this case.

On the other hand, the State argued that Vega-Gonzalez's initial attorney withdrew from the case in August 2016 and that no replacement attorney was appointed for several months. *See Davis*, 549 S.W.3d at 703 (explaining that delay from appointment of new counsel "was a justified delay"). Further, although the State acknowledged that there were delays in the testing done in this case, it clarified that it submitted certain items for testing but did not receive the report back until April 2018. *See id.* (stating that although delays in obtaining DNA results due to lab delays weighed against State, it did not weigh heavily against State). In addition, the State asserted that after the testing results showed that samples taken from Riley's body contained DNA from Vega-Gonzalez, it decided to request that the tampon collected during the investigation be tested, and the State emphasized that Vega-Gonzalez made no objection to the additional testing. Moreover, the State related that it was informed in January 2019 that screening for the additional testing was complete but that the results would not be ready for an additional six to eight months. Next, the State explained that after learning about how long it would take to obtain the results for the new testing, it told Vega-Gonzalez that it would be fine abandoning the testing on the tampon but that he requested that the testing be completed. *See id.* (observing that delay for continuance to obtain DNA testing results was "balanced out by [the defendant]'s initiation of the request for DNA testing, the benefit of having DNA testing, and the court's decision as to the necessity of" testing everything). Additionally, the State explained that it made arrangements with a private lab to test the tampon "and turn it around as quickly as possible." Further, the State emphasized that the results from the private lab were produced in

17

February 2019, that Vega-Gonzalez was arraigned in March 2019, and that the trial was set for May 2019.

At the hearing, the State also highlighted that Vega-Gonzalez did not file his motion to dismiss until April 2019 after the State asked for a continuance when it learned that one of its witnesses would be unavailable during the week of trial set by the trial court, and the State offered to have the trial earlier than the May setting. Vega-Gonzalez rejected the offer and stated that he could not have the trial before the May setting. The State also offered to have the witness deposed in order to have the trial at the scheduled setting, and the State emphasized that it was ready for trial.

Finally, the State highlighted that there were multiple other charges against Vega-Gonzalez and that the parties had been engaged in active plea negotiations until the trial date was set. *Cf. Munoz*, 991 S.W.2d at 824 (explaining that "[d]elay caused by good faith plea negotiations is not the result of negligence" or deliberate attempt to delay trial and deciding that "delay caused by good faith plea negotiations is a valid reason for the delay and should not be weighed against the prosecution").

Viewing the evidence in the light most favorable to the trial court's ruling, the record shows that the reasons for the lag before trial included delays due to plea negotiations, the appointment of new counsel, laboratory testing of the first items, additional testing requested by the State, Vega-Gonzalez insisting that the additional testing be completed even though the State explained that it planned to abandon that testing, and the State asking for a continuance because its witness was unavailable for the set trial date. Of those reasons, the appointment of counsel and the plea negotiations were justified delays. Although the delays due to the laboratory backlog and the State not requesting additional testing earlier weigh against the State, they do not

18

weigh heavily against the State, particularly where the results from the first round of DNA testing linked Vega-Gonzalez to the offense and formed the basis for the State seeking additional testing. Moreover, those delays are balanced by efforts undertaken by the State to have the additional testing done at a private lab to expedite the process after Vega-Gonzalez insisted that the testing be completed. Similarly, although the State requested a continuance after the trial was set for May 2019 when it learned that one of its witnesses would be out of town that week, the trial court explained during the hearing that it set that date, and the State offered to have the trial even earlier or to undertake alternative measures to obtain the witness's testimony. And the trial was ultimately held on the date previously scheduled. Under these circumstances, we conclude that the second *Barker* factor does not weigh heavily against the State.

*Assertion of the Right to Speedy Trial*

Although a "defendant has no duty to bring himself to trial," he "does have the responsibility to assert his right to a speedy trial." *Cantu*, 253 S.W.3d at 282. A "defendant's assertion of his speedy-trial right (or his failure to assert it) is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 283. "Filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Id.* "Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Id.* "A defendant's failure to timely demand a speedy trial indicates strongly that he did not really want one." *Davis*, 549 S.W.3d at 704. The longer the delay "the more likely a defendant who wished a speedy trial would be to take some action to obtain it." *Balderas*, 517 S.W.3d at 771 (quoting

19

*Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003)). Accordingly, "inaction weighs more heavily against a violation the longer the delay becomes." *Id.* (quoting *Dragoo*, 96 S.W.3d at 314). "A lengthy delay in asserting the right makes it difficult to prove denial of a speedy trial and tends to diminish the importance of the State's inability to excuse the delay." *Clarke v. State*, 928 S.W.2d 709, 714 (Tex. App.—Fort Worth 1996, pet. ref'd).

As set out above, Vega-Gonzalez was arrested in January 2016 and was indicted in July 2016. However, Vega-Gonzalez did not file a motion invoking his right to a speedy trial until June 2018. *See Orosco v. State*, 827 S.W.2d 575, 577 (Tex. App.—Fort Worth 1992, pet. ref'd) (noting that defendant "did not request a prompt trial until over two years after his indictment" when determining that defendant's right to speedy trial was not violated). Additionally, the State explained during the pretrial hearing that Vega-Gonzalez continued to participate in plea discussions during the time leading up to trial. Moreover, the motion was not filed until after incriminating DNA testing was obtained, and nothing in the record indicates that Vega-Gonzalez further pursued his motion for speedy trial; instead, the record shows that he subsequently moved to dismiss the case. *See Clarke*, 928 S.W.2d at 714 (concluding that trial court could have determined that assertion of right to trial was weak where defendant "did not pursue his motion for a speedy trial" after filing it and instead later "moved for dismissal"). Furthermore, as discussed previously, the State asserted during the hearing on the motion to dismiss that Vega-Gonzalez did not object to additional DNA testing and insisted that those tests be completed rather than abandoned as the State later suggested. *Cf. Davis*, 549 S.W.3d at 707 (determining that assertion of "right to speedy trial was ambiguous at best" where defendant "acquiesced to the delay caused by waiting for the DNA test results because he thought it was 'the best course of action'").

In light of the preceding and after viewing the record in the light most favorable to the trial court's ruling, we conclude that the third *Barker* factor weighs against Vega-Gonzalez.

*Prejudice*

In addressing the fourth *Barker* factor, appellate courts should bear in mind that "pretrial delay is often both inevitable and wholly justifiable" when determining whether and how much a defendant has been prejudiced by a delay. *Cantu*, 253 S.W.3d at 285 (quoting *Doggett v. United States*, 505 U.S. 647, 656 (1992)). Appellate courts should "consider three interests of defendants that the Speedy Trial Clause was designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Balderas*, 517 S.W.3d at 772. "The last interest is the most important because the fairness of the criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Id.* "As to the 'oppressive pretrial incarceration' subfactor, the 'dispositive consideration' is the impairment of a defendant's liberty with its effects upon the defendant." *Munoz*, 991 S.W.2d at 828. "[E]vidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation." *Cantu*, 253 S.W.3d at 286. Although a "defendant has the burden to make some showing of prejudice," "a showing of actual prejudice is not required." *Balderas*, 517 S.W.3d at 772.

During the pretrial hearing, the State explained that although Vega-Gonzalez was arrested in January 2016, he was released on bond three days later. Further, although the State related that Vega-Gonzalez was subsequently placed into custody in February 2018 and

remained in custody, the State also explained that he was placed into custody when he was arrested for allegedly committing the felony offense of manufacturing or delivering between four and 200 grams of cocaine and that he was also being detained because there was an immigration hold on him. *See* Tex. Health & Safety Code § 481.112(d); *see also Balderas*, 517 S.W.3d at 773 (noting that claim of prejudice was "undercut by the fact that he was being held on other serious charges"). Moreover, Vega-Gonzalez did not present testimony showing that the delay had resulted in his being anxious or concerned.

At the hearing, Vega-Gonzalez generally argued that he has been prejudiced by "the loss of memory, lack of witnesses, [and] lack of physical evidence that could have been procured over time" but provided evidence regarding how the delay prejudiced him. *Cf. State v. Dominguez*, No. 03-16-00095-CR, 2017 WL 4583210, at *5-6 (Tex. App.—Austin Oct. 12, 2017, no pet.) (mem. op., not designated for publication) (determining that defendant did not show that he suffered prejudice from alleged dimming memories and unavailability of witnesses when defendant "failed to explain how (or even claim that) his faded memory of the events would have been significant to the outcome of the case" and did not testify regarding "efforts to contact the purportedly unavailable witnesses" or how testimony from those witnesses "would have been relevant or contributed to his defense"). On the contrary, Vega-Gonzalez explained during the pretrial hearing that he was happy to proceed with the trial previously scheduled for May 13, 2019, because he wanted a trial, had been preparing, and was "ready to go." Moreover, to the extent that the delay at issue here neared or reached the point at which it is presumed that the delay prejudiced his defense, "this presumption is extenuated by [his] longtime acquiescence in the delay." *See Shaw v. State*, 117 S.W.3d 883, 890 (Tex. Crim. App. 2003).

After viewing the record in the light most favorable to the trial court's ruling, we conclude that the fourth *Barker* factor also weighs in favor of the State.

In summary, the first factor warranted consideration of the remaining *Barker* factors and weighed in favor of a speedy-trial violation, and the second factor only weighs slightly in favor of a violation. However, the third and fourth *Barker* factors do not weigh in favor of a violation. Accordingly, we conclude that the trial court did not abuse its discretion by denying Vega-Gonzalez's motion to dismiss and, therefore, overrule his third issue on appeal.

**Clerical Errors in the Judgment**

In a separately filed motion, the State argues that there were errors in the trial court's judgment and asks this Court to modify the judgment to correct those errors. First, the State contends that the judgment incorrectly states that Vega-Gonzalez waived his right to a jury trial when the record shows that this was a jury trial and that the jury convicted him of sexual assault. Next, the State argues that even though Vega-Gonzalez was convicted of sexual assault, the judgment did not specify that he was required to register as a sex offender.

This Court has the authority to modify incorrect judgments when it has the information necessary to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). In fact, "[a]ppellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record." *Morris v. State*, 496 S.W.3d 833, 836 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)).

23

As the State correctly points out, Vega-Gonzalez was convicted by a jury. Accordingly, we modify the trial court's judgment by replacing the phrase "Judgment of Conviction by Court—Waiver of Jury Trial" with the phrase "Judgment of Conviction by Jury." *See Carroll v. State*, No. 06-19-00261-CR, 2020 WL 4689197, at *3-4 (Tex. App.—Texarkana Aug. 13, 2020, pet. filed) (mem. op., not designated for publication) (making similar modification to judgment).

Regarding the State's second request, Vega-Gonzalez was convicted of sexual assault. *See* Tex. Penal Code § 22.011. Under the governing provisions of the Code of Criminal Procedure, a conviction for sexual assault is a "[r]eportable conviction or adjudication," *see* Tex. Code Crim. Proc. art. 62.001(5)(A), meaning that an individual convicted of that offense is required to register as a sex offender, *see id.* art. 62.051; *see also id.* art. 62.101 (setting out length of registration requirement). Because this case involved "an offense for which registration as a sex offender is required," the trial court was required to include in its judgment "a statement that the registration requirement . . . applies to the defendant and a statement of the age of the victim of the offense." *See id.* art. 42.01, § 1(27). "When the law requires the trial court to enter a particular finding in the written judgment of conviction," the trial court has no discretion not to enter the finding, and the failure to include it is a clerical error "that can properly be corrected nunc pro tunc." *Dewalt v. State*, 417 S.W.3d 678, 690 (Tex. App.—Austin 2013, pet. ref'd). Accordingly, we modify the trial court's judgment to reflect that Vega-Gonzalez is required to register as a sex offender and that the age of the victim at the time of the offense was nineteen years old. *See Epps v. State*, No. 05-19-00066-CR, 2019 WL 6799753, at *2 (Tex. App.—Dallas Dec. 13, 2019, no pet.) (mem. op., not designated for publication) (making similar modification to judgment).

24

For these reasons, we grant the State's motion.

## CONCLUSION

Having overruled all three of Vega-Gonzalez's appellate issues but having concluded that the written judgment of conviction contains non-reversible clerical errors, we modify the trial court's judgment as described above and affirm the judgment as modified.

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Goodwin and Baker

Modified and, As Modified, Affirmed

Filed:   December 2, 2020

Do Not Publish